UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

FRANCES A. BRYANT,

                              Case No.  04-40127

          Plaintiff,

                              District Judge Paul V. Gadola
v.                              Magistrate Judge R. Steven Whalen

CONTINENTAL CASUALTY COMPANY, et al.,

          Defendant.

_____/

### REPORT AND RECOMMENDATION

      Before the Court is a Complaint for Long Term Disability ("LTD") benefits brought under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §1001, *et. seq.* Defendants' Motion for Judgment on the Merits [Docket #27] and Plaintiff's Motion for Judgment on the Administrative Record, for Summary Judgment and/or to Permit Limited Discovery [Docket #26]  have been referred for a Report and Recommendation pursuant to 28 U.S.C. §636(b)(1)(B).  Because the Administrator acted arbitrarily and capriciously in denying LTD benefits,  I recommend that Defendant's motion  be DENIED, that Plaintiff's motion be GRANTED only to the extent that the case is remanded for further administrative review.

-1-

## I.   PROCEDURAL HISTORY

In 1994, Plaintiff began working for the Bartech Group as an administrative assistant. Plaintiff ceased work on March 27, 2001 after a hospitalization for pneumonia.  She subsequently received diagnoses of depression and lupus. *Complaint* at ¶¶ 10-11.  On April 9, 2001, Defendant Continental Casualty Company ("CCC") granted her short term disability benefits, retroactive to March 28, 2001 until June 27, 2001. *Id.* at ¶12.  On July 18, 2001, Defendant granted Plaintiff Long Term Disability ("LTD") benefits retroactive to June 28, 2001, but terminated LTD on February 26, 2002 *Id*. at ¶¶13-14.  On March 4, 2002, Defendant denied Plaintiff's administrative appeal, issuing a final denial on May 8, 2002. *Id.* at ¶15-16.  Plaintiff applied for Social Security benefits, which were granted with an onset day of March 28, 2001. ¶¶17-18.

Plaintiff also alleges that Defendant Continental Assurance Company, a subsidiary of CCC, "failed and refused" to waive Plaintiff's life insurance premiums during her disability, although the waiver was required under the terms of the plans.  *Id.* at ¶¶25-26. Plaintiff requests that the Court order the reinstatement of the benefit and waive the premiums for the duration of her disability. *Id*. at ¶27.  Last, Plaintiff alleges that Defendants breached their fiduciary duties in administering the life insurance plan pursuant to 29 U.S.C. 1104(a), maintaining that she "relied to her detriment on Defendants' misrepresentations by paying the premiums for six months on the individual policy," arguing that Defendants wrongly failed to inform her that she was eligible for a waiver of premium during her disability. *Id.* at ¶¶28-31.

Plaintiff filed her Complaint in this Court on May 5, 2004.   On January 27, 2005, the district court issued an stipulated order remanding the case to the Claims Administrator for further review [Docket #18]. On February 17, 2005, Plaintiff provided the Social Security Administration ("SSA") documents showing that SSA had found her disabled as of March 28, 2001, accompanied by  the medical records of Psychiatrist Dr. Rokeya Muharmeen, a consulting DDS physician (DIS AR 109-113, 116).  After Plaintiff's claims were again denied, the district court reinstated the case on July 11, 2005 [Docket #20].

## II.   FACTS

Through her employment with the Bartech Group, Plaintiff was provided with a LTD policy administered by Defendant CCC.   That  policy defines disability  as

> 1. "continuously unable to perform the *Material and Substantial Duties* of *Your Regular Occupation*; (emphasis in original)

> and

> 2. not working for wages in any occupation for which *You* are or become qualified by education, training or experience."

(DIS POL 15).  The policy terms also provide that "You may be considered *Disabled* . . . if an *Injury* or *Sickness is* causing physical or mental impairment to such a degree of severity that *You* are unable to earn more than 80% of *Your Monthly Earnings* in any occupation for which *You* are qualified by education, training or experience" *Id.* The policy further indicates that  the Bartech Group, which purchased the plan  from CCC, would also administer the plan, stating that "[t]he Administrator and other Plan fiduciaries have discretionary authority to interpret the terms of the Plan and to determine eligibility for and

entitlement to benefits in accordance with the Plan" (DIS POL 26).

### A.    Plaintiff's Treating Physicians

#### Robert W. Ike, M.D.

In September, 2001, Robert W. Ike, M.D., assessed Plaintiff with "[m]ild constitutional and musculoskeletal symptoms, failing to definitely support the suspected diagnosis of 'lupus' yet is suspicious for this diagnosis or other rheumatic disease problems" (DIS AR 198). In December, 2001 he commented that Plaintiff experienced "[p]ersistent functional, constitutional, and circulatory complaints . . . with unexplained acute cardiorespiratory features support definable rheumatic disease." (DIS AR 200).

#### William Armstrong, M.D.

In April, 2002, William Armstrong, M.D., noted that along with Plaintiff's diagnosis of lupus, recent tests indicated that Plaintiff may have experienced "a component of fibromyalgia" (DIS AR 79).  He observed that although Plaintiff's "pulmonary symptoms have stabilized," she had "very abnormal chest CT and PFTs," scheduling Plaintiff for further studies (DIS AR 79).  The next month, Dr. Armstrong concluded that Plaintiff was "stable from a cardiovascular standpoint," expressing concern that she had discontinued her Plaquenil (DIS AR 82).

#### Irene Kazmers, M.D.

In April, 2002, Irene Kazmers, M.D., a rheumatologist, found that along with a probable diagnosis of fibromyalgia, Plaintiff experienced "four criteria for Systemic Lupus

Erythematosus ("SLE"), specifically ANA, double-stranded DNA, pericarditis and arthritis, opining that "[w]ith this, she meets the criteria for a diagnosis of SLE" (DIS AR 76). As a result of Kazmers' findings, **Julie Morelock, M.D.,** Plaintiff's primary care physician, concluded that Plaintiff could not work full-time, recommending that her disability status should be reevaluated in 6-12 months (DIS AR 78). She noted that Plaintiff was starting plaquenil therapy for her condition, but would not be expected to show improvement for several months.

### Robert Hyzy, M.D.

In July, 2002, Robert Hyzy, M.D., treated Plaintiff at the Pulmonary Dyspnea Clinic at the University of Michigan Medical Center (DIS AR 86). He assessed Plaintiff with "dyspnea on exertion as well as a low diffusion which probably relate[s] both to her emphysema as well as possible interstitial lung disease, resultant from [SLE]" (DIS AR 192).

### Pieter Vreede, M.D.

In February, 2005, Pieter Vreede, M.D., found that Plaintiff's previous history of lupus was supported by a positive ANA (DIS AR 36). Noting that Plaintiff "did not look well," he stated that although she did not exhibit "definite symptoms or signs of acute joint inflammation," she experienced generalized arthralgias and myalgias. Dr. Vreede ordered preliminary studies for the purpose of reassessing her lupus status (DIS AR 36).

### B.   Defendant's Reviewing Medical Personnel

### Dr. Mark Friedman, M.D.

Dr. Mark Friedman submitted an internal medicine report on March 24, 2005, discussing Plaintiff's February, 2001 hospitalization (DIS AR 91). Friedman cited February, 2001 imaging studies showing pneumonia and pericardial thickening but noted that a followup examination on March 20, 2005 showed that Plaintiff had "gradually regained her strength," experiencing no shortness of breath or elevated temperature (DIS AR 92). Friedman concluded that "[t]he records by May of 2001 suggest that an episode of pneumonia had resolved," but explicitly declined to comment on Plaintiff's condition subsequent to February, 2002 due to the unavailability of medical records (DIS AR 96).

On May 5, 2005, Dr. Friedman completed an addendum to his March, 2005 report (DIS AR 24). He noted that Plaintiff was hospitalized in March of 2001 with pneumonia, pericarditis, and coronary artery disease, but by December, 2002 attending physicians found "no evidence of functional limitations due to cardiac disease" (DIS AR 25). Friedman further noted that Plaintiff's pulmonary consultant, Dr. Paine, found abnormal pulmonary function testing "with shortness of breath on exertion and decreased exercise tolerance," but indicated that he was unable to give a more recent update of her condition (DIS AR 25). The Addendum further discussed the findings of treating physicians Armstrong, Ike, Morelock, Kazmers, and Hyzy, concluding that additional medical evidence supplied from March, 2002 and July, 2002 "does not support an inability to sit for seven hours per day, walk for one hour per day," or limit Plaintiff's ability to lift under five pounds[1] (DIS AR 25-

---

[1]In the last paragraph of DIS AR 29 Friedman summarizes Dr. Armstrong's April, 2002 examination of Plaintiff. In addition to relating Armstrong's findings, Friedman

-6-

31).  Friedman termed Plaintiff's history of fatigue as "nonspecific and possibly attributable to her chronic obstructive pulmonary disease, rheumatologic disease and/or depression," stating that his conclusions were "based on physical findings rather than interpretations of subjective symptoms" (DIS AR 31).

**Dr. Rokeya Muharmeen, M.D.**

Dr. Muharmeen performed a consultive exam of Plaintiff on behalf of the SSA in August, 2002 (DIS AR 109). Dr. Muharmeen noted that Plaintiff sought medical treatment one month before her alleged March, 2001 disability date for shortness of breath and chest pains (DIS AR 109).  Plaintiff told Muharmeen that she received a diagnosis of pneumonia before Dr. Armstrong concluded in March, 2001 that she experienced pericarditis.  She indicated that she received an additional diagnosis of lupus in April, 2002, which was confirmed by a University of Michigan physician, but later contradicted by Dr. Ike, who informed her she was "fine."  Plaintiff complained that severe fatigue and pain prevented her from cleaning her house, engaging in outside activities, and taking care of her personal needs (DIS AR 110).  She alleged that her physical problems left her "severely depressed" (DIS AR 111).  Dr. Muharmeen assigned Plaintiff a GAF of 50[2] (DIS AR 113).

---

interjects his own conclusion that "it is difficult to quantify [the limitations caused by SLE] or separate [it] from other potential causes such as depression, etc., and evaluate this in terms of its limitation on functional status, particularly with regard to work" (DIS AR 29-30)

[2]A GAF score of 41-50 indicates "[s]erious symptoms ... [or] serious impairment in social, occupational, or school functioning," such as inability to keep a job. American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* at 34 (*DSM-IV-TR* ) (4th ed.2000).

### C.   The Administrative Decision

The final denial of Plaintiff's request for LTD benefits was issued on May 9, 2005

(DIS AR 11-12). The letter draws in large part on Dr. Friedman's findings, stating that

> "[w]e are not disputing her pulmonary complaints and symptoms, which
> appear to be a combination of COPD secondary to cigarette smoking and
> possibly an interstitial disease, but these findings alone would not preclude
> Ms. Bryant from engaging at a sedentary level of activity. In addition, there
> is no evidence of any joint limitation or organ dysfunction that would prevent
> Ms. Bryant from performing at a sedentary level." (DIS AR 12).

The denial letter also concluded that the SSA's disability determination did not

persuade Defendant to award benefits, stating that "[t]he psychiatric evaluation performed

. . . at the request of the [SSA] did not reveal any significant pathologies or abnormalities that

would preclude Ms. Bryant from working," adding that Dr. Muhaimeen's August, 2002

report indicated that Plaintiff's condition "appears to have only moderately restricted her

ability to perform normal daily activities" (DIS AR 12).

### III.   STANDARD OF REVIEW

Under ERISA, when a plan administrator, such as Defendant in this case, has the

discretionary authority to determine eligibility for benefits, federal courts review a decision

to deny benefits under "the highly deferential arbitrary and capricious standard of review."

*McDonald v. Western-Southern Life Ins. Co.*, 347 F.3d 161, 168-69 (6th Cir. 2003), quoting

*Yeager v. Reliance Standard Life Ins. Co.*, 88 F.3d 376, 380 (6th cir. 1996). "[T]he arbitrary

and capricious standard is the least demanding form of judicial review of administrative

action. When applying the arbitrary and capricious standard, the Court must decide whether

the plan administrator's decision was rational in light of the plan's provisions. Stated differently, when it is possible to offer a reasoned explanation, based on the evidence, for a particular outcome, that outcome is not arbitrary or capricious." *Williams v. International Paper Co.*, 227 F.3d 706, 712 (6th Cir. 2000)(internal citations and quotations omitted).

Nevertheless, "[d]eferential review is not no review, and deference need not be abject." *McDonald, supra*, 347 F.3d at 172 (internal citations omitted). *See also Hackett v. Xerox Corp. Long-Term disability Income Plan*, 315 F.3d 771, 774-75 (7th Cir. 2003) ("Review under the deferential arbitrary and capricious standard is not a rubber stamp and deference need not be abject. Even under the deferential review we will not uphold a termination when there is an absence of reasoning in the record to support it"); *Swaback v. American Info. Techs. Corp.*, 103 F.3d 535, 540 (7th Cir. 1996) ("Although we review the committees' actions in a deferential light, we shall not rubber stamp their decisions."); *Finazzi v. Paul Revere Life Ins. Co.*, 327 F.Supp.2d 790, 796 (W.D. Mich. 2004) ("the Court is not obliged to 'rubber stamp' [defendant's] termination of benefits where, considering all the evidence, its reasoning is not trustworthy."). As the Sixth Circuit stated in *McDonald*, 347 F.3d at 172:

> "[T]he district court had an obligation under ERISA to review the administrative record in order to determine whether the plan administrator acted arbitrarily and capriciously in making ERISA benefits determinations. This obligation inherently includes some review of the quality and quantity of the medical evidence and the opinions on both sides of the issues. Otherwise, courts would be rendered to nothing more than rubber stamps for any plan administrator's decision as long as the plan was able to find a single piece of evidence–no matter how obscure or untrustworthy–to support a denial of a claim for ERISA benefits."

-9-

# IV.   ANALYSIS

## A.  The Non-Disability Finding

Plaintiff argues that the denial of benefits was arbitrary and capricious.  *Motion for Judgment* at 12 [Docket #26].  She notes that although her medical records establish that she has "lupus with a well-documented symptom of severe fatigue," along with depression, Dr. Friedman improperly discounted these conditions, justifying his non-disability finding by stating that her physician did not define her level of work function.  *Id.* at 14.  Similarly, she argues that although the Administrator was not bound by the SSA disability determination or the opinions of her treating physicians, his failure to accord any weight to the views supporting disability amounts to a distortion of the record.  *Id.* at 13-14.

The Supreme Court has held that, unlike the rule in Social Security disability cases, treating physicians are not given deference in ERISA review.  *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 832-33, 123 S.Ct. 1965, 155 L.Ed.2d 1034 (2003). Nevertheless, the Court in *Nord* felt constrained to add that "[p]lan administrators, of course, may not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician."  *Id.*  In addition, the Sixth Circuit recently held that while there is no "treating physician rule" in ERISA cases, "[w]hether a doctor has physically examined the claimant is indeed one factor that we may consider in determining whether a plan administrator acted arbitrarily and capriciously in giving greater weight to the opinion of its consulting physician."  *Kalish v. Liberty Mutual/Liberty Life Assurance Co. Of Boston*, 419

F.3d 501, 507 (6th Cir. 2005).[3]

Likewise, although the SSA's findings are not binding on the Administrator (due to the SSA's reliance on the treating physician rule) a SSA determination is highly relevant to the decision at hand.

> "[T]he SSA determination, though certainly not binding, is far from meaningless. As the Court said in *Black & Decker,* a plan administrator may not arbitrarily disregard the medical evidence proffered by the claimant, including the opinions of her treating physicians. 538 U.S. at 834, 123 S.Ct. 1965. Here, the SSA determination, at a minimum, provides support for the conclusion that an administrative agency charged with examining Calvert's medical records found, as it expressly said it did, objective support for [the treating physician's disability opinion]."

*Calvert v. Firstar Finance, Inc*.,  409 F.3d 286, 294 (6th Cir. 2005).

To qualify for benefits under the terms of Plaintiff's LTD policy she must demonstrate an underlying medical condition or injury and further, that the condition or injury renders the claimant unable to perform the material and substantial duties of  her regular occupation.  I find that Defendant's decision as to each of these factors was arbitrary

---

[3] While the Supreme Court in *Nord,* rejecting the treating physician rule, commented that "a treating physician, in a close case, *may* favor a finding of 'disabled,'" 538 U.S. at 832 (emphasis added), it also acknowledged "that physicians repeatedly retained by benefits plans may have an incentive to make a finding of 'not disabled' in order to save their employers['] money and preserve their own consulting arrangements." *Id.*  In *Kalish, supra* at 507-508, the Sixth Circuit stated that it "has similarly observed that a plan administrator, in choosing the independent experts who are paid to assess a claim, is operating under a conflict of interest that provides it with a 'clear incentive to contract with individuals who were inclined to find in its favor that [a claimant] was not entitled to continued [disability] benefits.'  *Calvert v. Firstar Fin., Inc.*, 409 F.3d 286, 292 (6th cir. 2005) (noting that the 'possible conflict of interest inherent in this situation should be taken into account as a factor in determining whether [a plan administrator's] decision was arbitrary and capricious')."

-11-

and capricious.

Defendants focus on the obscure and ignore the obvious. First, after receiving a diagnosis explaining her continued pain and fatigue, Plaintiff's case for disability was clearly premised upon debilitating symptoms of SLE. Despite this, Dr. Friedman's report focuses largely on the fact that her *pulmonary condition* has either stabilized or resolved, adding that "[h]er general physical examination was unremarkable with regard to musculoskeletal findings and from a pulmonary point of view her limitations would not have likely restricted a sedentary occupation" (DIS AR 30-31). However he glosses over the fact that after Dr. Kazmers' April, 2002 diagnosis of SLE, none of her treating physicians or the SSA disputed that she experienced lupus[4] (DIS AR 30-31,76).

Worse yet, Friedman erroneously concludes that "evaluation[s] by the specialists in the additional records submitted are supportive of the conclusion that there is no objective evidence of functional impairment from a sedentary occupation," apparently according no weight whatsoever to Dr. Morelock's April, 2002 opinion that Plaintiff should be precluded from all work due to her diagnosis (DIS AR 31). Friedman further discounts that disability opinion by stating that it gives "[l]ittle detail . . . regarding specific functional status, clinical findings, or explanation of symptoms" (DIS AR 29). To the contrary, Morelock's April 18, 2002 opinion, made after she ordered and received the results of studies performed by Kazmers, addresses all three of these issues: functional status (disabled), clinical findings

_____

[4]Plaintiff complained of lupus symptoms to Dr. Ike at least as early as September, 2001 (DIS AR 198).

-12-

(Dr. Kazmers' diagnosis), and explanation of symptoms ("significant fatigue attributable to SLE")[5](DIS AR 78).

The summary of Plaintiff's mental condition, found in the letter denying her final administrative appeal, is equally misleading.  While the letter referenced Dr. Muhaimeen's August 14, 2002 mental health assessment, the letter erroneously concludes that Muhaimeen's examination indicated that Plaintiff was "only moderately restricted [in] her ability to perform her normal daily activities" (DIS AR 12).  This amounts to a blatant misreading of Muhaimeen's findings which included assigning Plaintiff a GAF of 50 (see FN 2) indicating that Plaintiff experienced *serious* rather than *moderate* social and occupational impairments, including the inability to keep a job.

The "arbitrary and capricious" standard is highly deferential, but it bears repeating that "[d]eferential review is not no review, and deference must not be abject."  *McDonald*, *supra*, 347 F.3d at 172.  This Court does not owe any deference to a decision which places undue emphasis on the aspects of Plaintiff's conditions that are stabilized or improving, while ignoring or mistating medical reports and the SSA's findings that Plaintiff is disabled due to depression and SLE.  The Administrator's ostrich-like determination to ignore the import of these diagnoses casts doubt on the conclusion that Plaintiff is not precluded from the material and substantial duties of her job.   While the record amply supports Plaintiff's

---

[5]Defendants *Motion for Judgment on the Merits* [Docket #27] discounts Morelock's opinion by implying  that Morelock offered to write a temporary disability opinion at the initial consultation.  *Id.* at 27.  However, Morelock wrote her disability letter the next month - after Dr. Kazmers, a specialist,  found that Plaintiff experienced SLE.

claim for LTD benefits as a result of SLE and depression, Defendant should be allowed the opportunity, if possible, to fully take into account these conditions in making a proper and undistorted review of the record. *See University Hospitals of Cleveland v. Emerson Elec. Co.* 202 F.3d 839, 852 (6th Cir. 2000) (Remand for administrative review appropriate for a failure to reach an issue necessary for the determination of an award of benefits). For the same reasons, I have considered, but  will deny  Plaintiff's request for limited discovery on the issue of bias, finding instead that the bias, if any, can be cured by a remand for further fact-finding with explicit directions to consider the effects of SLE and depression on Plaintiff's ability to perform her former work.

### B.  Life Insurance Policies

First,  Plaintiff's argues that she was wrongfully denied a waiver of premiums on her $10,000 life Basic Group Life Plan, disputing Defendants' position that she is not sufficiently disabled to trigger the waiver provision, *Motion for Judgment* at 16 [Docket #26];WOP POL 7.  Next, she contends that the claim administrator improperly concluded that she was never qualified for benefits under the Voluntary Group Life Plan ($100,000) due to her failure to submit evidence of insurability at the time she applied for coverage (see WOP POL 21). Plaintiff disputes this finding, asserting that Defendants breached their fiduciary duties by accepting her premiums without notifying her that her policy was unenforceable.[6]

---

[6]Defendants argue that Plaintiff's breach of fiduciary claim should fail as a matter of law.  However, for the reasons set forth in this section, the general question of whether the $100,000 policy is enforceable should be decided after the Administrator determines upon remand  whether Plaintiff is disabled.

Plaintiff's claim that she is entitled to reinstatement and waiver of premiums on the $10,000 policy turns exclusively on whether she is actually disabled (see WOP POL 4, 7), and should thus be remanded with the question of disability, discussed in section **A.**  In contrast,  Plaintiff's claims under the Voluntary Group Life Plan ($100,000) to participate and receive a waiver of premiums during her disability rest additionally upon the question of whether Defendants misrepresented her rights and duties under the policy.  However, Plaintiff's remedies, if any, in her Voluntary Group Life Plan claim will be dictated in large part by a determination of whether she is disabled (WOP POL 31), i.e., renewed participation in the policy, a refund of past premiums, or a waiver of premium.  Accordingly, this issue, intertwined with the above questions, should be decided subsequent to a disability determination.  For these reasons along with those set forth in section **A.**, all three counts should be remanded for further fact-finding.

## V.  CONCLUSION

For these reasons, I recommend that Defendant's motion for summary judgment be DENIED, that Plaintiff's motion for summary judgment be GRANTED only to the extent that the case is remanded for further administrative review.

Any objections to this Report and Recommendation must be filed  within ten (10) days of service of a copy hereof as provided for in 28 U.S.C. §636(b)(1) and E.D. Mich. LR 72.1(d)(2).  Failure to file specific objections constitutes a waiver of any further right of appeal.  *Thomas v. Arn*, 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Howard v. Secretary of HHS*, 932 F.2d 505 (6th Cir.  1991); *United States v. Walters*, 638 F.2d 947 (6th

-15-

Cir. 1981). Filing of objections which raise some issues but fail to raise others with specificity will not preserve all the objections a party might have to this Report and Recommendation. *Willis v. Secretary of HHS*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within ten (10) days of service of any objecting party's timely filed objections, the opposing party may file a response. The response shall be not more than twenty (20) pages in length unless by motion and order such page limit is extended by the court. The response shall address specifically, and in the same order raised, each issue contained within the objections.

S/R.  Steven Whalen
R.  STEVEN WHALEN
UNITED STATES MAGISTRATE JUDGE

Dated:  August 31, 2006

CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing order was served on the attorneys and/or parties of record by electronic means or U.S. Mail on August 31, 2006.

S/Gina Wilson
Judicial Assistant

-16-